## ANCILLARY SERVICES PROVIDER AGREEMENT

THIS ANCILLARY SERVICES PROVIDER AGREEMENT ("Agreement") is made and entered into as of _2/1/2012_ ("Effective Date"), by and between [_Diabetes Management + Supplies_] _LLC_ ("Provider") and Louisiana Healthcare Connections ("CCN").

WHEREAS, Provider is a provider of _Diabetic DME_ services duly licensed and operating in accordance with all applicable State and federal laws and regulations; and

WHEREAS, CCN is a duly licensed coordinated care network authorized to arrange for the provision of Covered Services to Covered Persons (as hereinafter defined); and

WHEREAS, CCN wishes to contract with Provider to provide certain Covered Services to Covered Persons; and

WHEREAS, Provider desires to provide the Covered Services specified in this Agreement to Covered Persons for the consideration, and under the terms and conditions, set forth in this Agreement; and

NOW, THEREFORE, in consideration of the premises and mutual promises herein stated, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement and each of its Attachments, each of the following terms (and the plural thereof, when appropriate) shall have the meaning set forth herein.

1. **Affiliate(s)** means a person or entity controlling, controlled by, or under common control with CCN.

2. **Attachment(s)** means the attachments to this Agreement, including addenda and exhibits, incorporated herein by reference.

3. **Clean Claim** has, as to each particular product, the meaning set forth in the Attachment pertaining to each such product. If there is no definition for a particular product, "Clean Claim" shall have the meaning set forth in the Provider Manual.

4. **Covered Person** means a person eligible for and enrolled in CCN or an Affiliate to receive Covered Services.

5. **Covered Services** means those Medically Necessary health care services covered under the terms of the applicable Payor Contract and rendered in accordance with the Provider Manual.

6. *Emergency or Emergency Care* has, as to each particular product, the meaning set forth in the Attachment pertaining to each such product.  If there is no definition for a particular product, Emergency Care shall mean inpatient and outpatient Covered Services furnished by a qualified provider that are needed to evaluate or stabilize an Emergency Medical Condition.

7. *Emergency Medical Condition* means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in the following: (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

8. *Medical Director* means a duly licensed physician or his/her physician designee designated by CCN to monitor and evaluate the appropriate utilization of Covered Services by Covered Persons.

9. *Medically Necessary* means, unless otherwise defined in the applicable Attachment, any health care services determined by CCN's Medical Director or Medical Director's designee to be required to preserve and maintain a Covered Person's health, provided in the most appropriate setting and in a manner consistent with the most appropriate type, level, and length of service, which can be effectively and safely provided to the Covered Person, as determined by acceptable standards of medical practice and not solely for the convenience of the Covered Person, Covered Person's physician, Provider or other health care provider.

10. *Participating Health Care Provider* means any physician, hospital, ancillary, or other health care provider that has contracted directly or indirectly with CCN to provide Covered Services to Covered Persons and is credentialed in accordance with the CCN's credentialing criteria.

11. *Payor* means CCN or another entity that is responsible for funding Covered Services to Covered Persons.

12. *Payor Contract* means CCN's contract with any Payor that governs provision of Covered Services to Covered Persons.  Where CCN is the Payor, "Payor Contract" means CCN's contract with the State or federal agency or other entity that has contracted with CCN to arrange for the provision of Covered Services to eligible individuals of such agency or other entity.

13. *Provider Manual* means the CCN manual of policies, procedures, and requirements to be followed by Participating Health Care Providers.  The Provider Manual includes, but is not limited to, utilization management, quality management, grievances and appeals, and Payor-specific program requirements, and may be changed from time to time by CCN.

14. *State* is defined as the state set forth in the Attachment(s) attached hereto.

## ARTICLE II
## CCN'S OBLIGATIONS

1. <u>Administration</u>.  CCN shall be responsible for the administrative activities necessary or required for the commercially reasonable operation of a coordinated care network.  Such activities shall include, but are not limited to, quality improvement, utilization management, grievances and appeals, claims processing, and maintenance of provider directory and records.

2. <u>Provider Manual</u>.  CCN shall make the Provider Manual available to Provider via CCN's website and upon Provider's request.  CCN shall post changes to the Provider Manual on CCN's website or provide Provider with prior written notice of material changes to the Provider Manual.

3. <u>Identification Cards</u>.  CCN or Payor shall issue to Covered Persons an identification card that shall bear the name of the Covered Person, and a unique identification number.

4. <u>Benefits and Eligibility Verification</u>.  CCN or Payor, as determined by the Payor Contract, shall be responsible for all eligibility and benefit determinations regarding Covered Services and all communications to Covered Persons regarding final benefit determinations, eligibility, bills, and other matters relating to their status as Covered Persons.

5. <u>CCN's Medical Director</u>.  CCN shall provide a Medical Director to be responsible for the professional and administrative medical affairs of CCN.

## ARTICLE III
## PROVIDER'S OBLIGATIONS

1. <u>Covered Services</u>.  Provider shall provide to Covered Persons those Covered Services described in the applicable Attachment(s) in accordance with the Provider Manual and according to the generally accepted standards of medical practice in the Provider's community, the scope of Provider's license, and the terms and conditions of this Agreement. Provider shall make necessary and appropriate arrangements to assure the availability of Covered Services to Covered Persons during business hours consistent with like providers and in accordance with applicable State and federal law and the Payor Contract.

2. <u>Compliance with CCN Policies and Procedures</u>.  Provider warrants that Provider and all persons providing services hereunder on Provider's behalf ("Provider Personnel"), shall at all times cooperate and comply with the policies and procedures of CCN, including, but not limited to, the following:

   A.  CCN's credentialing criteria;

   B.  CCN's Provider Manual;

C.  CCN's medical management program including quality improvement, utilization management, disease management, and case management;

D.  CCN's grievance and appeal procedures; and

E.  CCN's coordination of benefits and third party liability policies.

3.  <u>Determination of Covered Person Eligibility</u>.  Provider shall verify, in accordance with the Provider Manual, whether an individual seeking Covered Services is a Covered Person.  If CCN determines that such individual was not eligible for Covered Services at the time the services were rendered, such services shall not be eligible for payment under this Agreement, and Provider may bill the individual or other responsible entity for such services.

4.  <u>Emergency Care</u>.  Provider shall provide Emergency Care in accordance with applicable federal and State laws and the Payor Contract.  Provider shall notify CCN within twenty-four (24) hours or by the next business day of rendering or learning of the rendering of Emergency Care to a Covered Person.

5.  <u>Acceptance of New Patients</u>.  To the extent that Provider is accepting new patients, Provider must also accept new patients who are Covered Persons of CCN.  Provider shall provide CCN forty-five (45) days written notice prior to Provider's decision to no longer accept Covered Persons of CCN or any other Payor.  In no event shall any established patient of any Provider who becomes a Covered Person be considered a new patient.

6.  <u>Referrals; Reporting to Primary Care Physician</u>.  Provider shall provide Covered Services to Covered Persons upon referral from a CCN primary care physician ("PCP") or CCN, and shall arrange for any appropriate referrals and/or admissions of Covered Persons, in accordance with the requirements of the Provider Manual.  Provider shall, within a reasonable time following consultation with, or testing of, a Covered Person (not to exceed one (1) week), make a complete written report to the Covered Person's PCP, provided that, with respect to findings which may indicate a need for immediate or urgent follow-up treatment or testing or which may indicate a need for further or follow-up care outside the scope of the referral authorization or outside the scope of Provider's area of expertise, the Provider shall provide an immediate oral report to the Covered Person's PCP, not to exceed twenty-four (24) hours from the time of Provider's consultation or Provider's receipt of the report of the testing, as applicable.

7.  <u>Preferred Drug List/Drug Formulary</u>.  If applicable to the Covered Person's coverage, Provider shall abide by CCN's formulary or preferred drug list when prescribing medications for Covered Persons.

8.  <u>Treatment Decisions</u>.  CCN shall not be liable for, nor will it exercise control over, the manner or method by which Provider provides or arranges for Covered Services.  Provider understands that CCN's determinations, if any, to deny payments for services which CCN does not deem to constitute Covered Services or which were not provided in accordance with the requirements of this Agreement, the Attachments or the Provider Manual, are

administrative decisions only. Such a denial does not absolve Provider of Provider's responsibility to exercise independent judgment in Covered Person treatment decisions. Nothing in this Agreement is intended to interfere with Provider's provider-patient relationship with Covered Person(s).

9. <u>Facilities</u>. Provider agrees that the facilities at which Covered Services are provided hereunder shall be maintained in accordance with all applicable federal and State laws.

10. <u>Covered Person Communication</u>. Provider shall obtain Payor and CCN's approval for Covered Person communication as required by the Payor Contract and applicable State and federal law. Nothing in this Agreement shall be construed as limiting Provider's ability to communicate with Covered Persons with regard to quality of health care or medical treatment decisions or alternatives regardless of Covered Service limitations under the Payor Contract.

11. <u>Cooperation with CCN Carve-Out Vendors</u>. Provider acknowledges that CCN may, during the term of this Agreement, carve-out certain Covered Services from its general provider contracts, including this Agreement, as CCN deems necessary to promote the quality and cost-effectiveness of services provided to Covered Persons. Provider shall cooperate with any and all third party vendors that have contracted with CCN or an Affiliate of CCN to provide services to Covered Persons.

12. <u>Disparagement Prohibition</u>. Provider agrees not to disparage CCN in any manner during the term of this Agreement or in connection with any expiration, termination or non-renewal of this Agreement. Provider shall not interfere with CCN's contractual relationships including, but not limited to, those with other Participating Health Care Providers. Nothing in this provision, however, shall be construed as limiting Provider's ability to inform patients that this Agreement has been terminated or otherwise expired or to promote Provider to the general public or to post information regarding other health plans consistent with Provider's usual procedures, provided that no such promotion or advertisement is directed at any specific Covered Person or group of Covered Persons.

13. <u>Nondiscrimination</u>. Provider will provide services to Covered Persons without discrimination on account of race, sex, sexual orientation, age, color, religion, national origin, place of residence, health status, type of Payor, source of payment, physical or mental disability or veteran status, and will ensure that its facilities are accessible as required by Title III of the Americans With Disabilities Act of 1991 ("ADA"). Provider recognizes that as a governmental contractor, CCN is subject to various federal laws, executive orders and regulations regarding equal opportunity and affirmative action, which also may be applicable to subcontractors.

14. <u>Written Notice</u>. Provider shall give written notice to CCN of: (i) any situation which develops regarding Provider, when notice of that situation has been given to the State agency that licenses Provider, or any other licensing agency or board, or any situation involving an investigation or complaint filed by the State agency that licenses Provider, or any other licensing agency or board, regarding a complaint against Provider's license; (ii) when a

change in Provider's license to practice medicine is affected or any form of reportable discipline is taken against such license; (iii) suspension or exclusion under a federal health care program, including, but not limited to, Medicaid; (iv) any government agency request for access to records; or (v) any lawsuit or claim filed or asserted against Provider alleging professional malpractice, regardless of whether the lawsuit or claim involves a Covered Person. In any such instance described above, Provider must notify CCN in writing within ten (10) days from the date Provider first receives notice, whether written or oral, with the exception of those lawsuits or claims which do not involve a Covered Person, with respect to which Provider has thirty (30) days to notify CCN.

15. <u>Use of Name</u>.  Provider agrees that CCN may use Provider's name, address, phone number, type of practice, and an indication of Provider's willingness to accept additional Covered Persons in CCN's roster of Participating Health Care Providers and marketing materials.

## ARTICLE IV
## COMPLIANCE WITH LAW

1. <u>Compliance with Law and Payor Contracts</u>.  Provider and CCN agree that each party shall carry out its obligations in accordance with terms of the Payor Contract and applicable federal and State laws and regulations, including, but not limited to, the requirements of the Stark law (42 U.S.C. § 1395nn) and applicable federal and State self-referral and fraud and abuse statutes and regulations.  If, due to Provider's noncompliance with law, the Payor Contract or this Agreement, sanctions or penalties are imposed on CCN, CCN may, in its sole discretion, offset sanction or penalty amounts against any amounts due Provider from CCN or require Provider to reimburse CCN for the amount of any such sanction or penalty.

2. <u>HIPAA Compliance</u>.  Provider and CCN shall abide by the administrative simplification provisions of the Health Insurance Portability and Accountability Act ("HIPAA"), its implementing regulations [42 C.F.R. parts 160 and 164] and all other federal and State laws regarding confidentiality and disclosure of medical records and other health and Covered Person information, including safeguarding the privacy and confidentiality of any protected health information ("PHI") that identifies a particular Covered Person.  Provider shall assure its own compliance and that of its business associates with HIPAA.

## ARTICLE V
## CLAIMS SUBMISSION, PROCESSING, AND COMPENSATION

1. <u>Claims or Encounter Submission</u>.  Provider shall submit to Payor claims or encounters for Covered Services in accordance with the Provider Manual.  Payor reserves the right to deny payment to Provider if Provider fails to submit in accordance with the Provider Manual.  If applicable based on Provider's compensation arrangement, Provider shall submit encounter data to Payor in a timely fashion, which shall contain such statistical and descriptive medical and patient data and identifying information as specified in the Provider Manual.

2. <u>Compensation</u>.  Payor shall pay Clean Claims from Provider for Covered Services provided to Covered Persons in accordance with the applicable Exhibit less any applicable

copayments, cost-sharing or other amounts that are the Covered Person's financial responsibility.

3. Financial Incentives.  Nothing in this Agreement shall, or shall be construed to, create any financial incentive for Provider to withhold Medically Necessary services.

4. Covered Person Hold Harmless.  Provider agrees that in no event including, but not limited to, non-payment by CCN, CCN insolvency, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Covered Person for Covered Services provided pursuant to this Agreement.  This provision shall not prohibit collection of any applicable copayments or other amounts that are the Covered Person's financial responsibility.  This provision shall survive termination or expiration of this Agreement for any reason, shall be construed for the benefit of Covered Persons, and supersedes any oral or written agreement entered into between the Provider and a Covered Person.

5. Recoupment Rights.  Payor shall have the right to immediately recoup any and all amounts owed by Provider to Payor or any Affiliate against amounts owed by Payor or Affiliate to Provider.  Provider agrees that all recoupment and any offset rights under this Agreement shall constitute rights of recoupment authorized under State or federal law and that such rights shall not be subject to any requirement of prior or other approval from any court or other government authority that may now have or hereafter have jurisdiction over Provider.

## ARTICLE VI
## RECORDS/INSPECTIONS

1. Medical Records/Advance Directives.  Provider shall maintain a complete and accurate permanent medical record for each Covered Person to whom Provider renders services under this Agreement and shall include in that record all reports from Participating Health Care Providers and all documentation required by applicable law, regulations, professional standards and the Provider Manual.  Provider shall document in the Covered Person's medical record whether the Covered Person has executed an advance directive and agrees to comply with all federal and State laws regarding advance directives.  Medical records of Covered Persons shall be treated as confidential so as to comply with all federal and State laws and regulations regarding the confidentiality of the patient records.

2. Records.  Provider shall maintain records related to services provided to Covered Persons and provide such medical, financial and administrative information to CCN and State and federal government agencies as may be necessary for compliance by CCN with State and federal law and accreditation standards, as well as for the administration of this Agreement.  CCN shall have access at reasonable times to books, records, and papers of the Provider relating to the health care services provided to Covered Persons for Covered Services.

3. Consent to Release Medical Records.  Provider shall obtain Covered Person authorizations relative to the release of medical information required by applicable law to provide CCN or other authorized parties with access to Covered Persons' records.

4. <u>Access</u>.   In accordance with applicable law, Provider shall provide access to Provider's records to the following, including any designee or duly authorized agent:

    A.   Payors, during regular business hours and upon prior notice;

    B.   government agencies, to the extent such access is necessary to comply with regulatory requirements that apply to CCN or Payors; and

    C.   accreditation agencies.

Provider shall provide copies of records at no expense.

5. <u>Record Transfer</u>.   Subject to applicable law and Payor Contract requirements, Provider shall cooperate in the timely transfer of Covered Persons' medical records to any other health care provider at no charge and when required.

6. <u>On-Site Inspections</u>.   Provider agrees that medical office space or its facilities, as applicable, shall be maintained in accordance with applicable federal and State regulatory requirements. Provider shall cooperate in on-site inspections of medical office space by CCN, authorized government officials, and accreditation bodies.   Provider shall compile any and all information in a timely manner required to evidence Provider's compliance with this Agreement, as requested by such agency(ies), or as otherwise necessary for the expeditious completion of such on-site inspection.

## ARTICLE VII
## INSURANCE

1.  <u>Provider Insurance</u>. During the term of this Agreement, Provider shall maintain policies of general and professional liability insurance and other insurance that are necessary to insure Provider, and any other person providing services hereunder on Provider's behalf, against any claim(s) of personal injuries or death alleged or caused by Provider's performance under this Agreement.   Such insurance shall include, but not be limited to, tail or prior acts coverage necessary to avoid any gap in coverage.   Insurance shall be through a licensed carrier, and in a minimum amount of one million dollars ($1,000,000) per occurrence, and have an annual aggregate of no less than three million dollars ($3,000,000) unless a lesser amount is accepted by CCN or where State law mandates otherwise.   Provider will provide CCN with at least fifteen (15) days notice of such cancellation, non-renewal, lapse, or adverse material modification of coverage.   Upon CCN's request, Provider will furnish CCN with evidence of such insurance.

2. <u>Other Insurance</u>.   All parties to this Agreement shall maintain in full force and effect appropriate workers' compensation protection and unemployment insurance as required by law.

## ARTICLE VIII
## INDEMNIFICATION

1. <u>CCN Indemnification</u>.   Provider agrees to indemnify and hold harmless (and at CCN's request defend) CCN, its Affiliates, officers, employees and agents from and against any and all claims, loss, damages, liability, costs, expenses (including reasonable attorney's fees), judgments, or obligations arising from or in connection with third party claims alleging any negligence or otherwise wrongful act or omissions of  Provider, its agents or employees in the performance of Provider's obligations under this Agreement.

2. <u>Provider Indemnification</u>.  CCN agrees to indemnify and hold harmless (and at Provider's request defend) Provider, its officers, employees and agents from and against any and all claims, loss, damages, liability, costs, expenses (including reasonable attorney's fees), judgments, or obligations arising from or in connection with third party claims alleging any negligence or otherwise wrongful act or omission of CCN, its agents or employees in the performance of CCN's obligations under this Agreement.

## ARTICLE IX
## DISPUTE RESOLUTION

1. <u>Informal Dispute Resolution</u>.  Any disputes between the parties arising with respect to the performance or interpretation of this Agreement ("Dispute") shall first be resolved by exhausting the processes available in the Provider Manual, then through good faith negotiations between designated representatives of the parties that have authority to settle the Dispute.  If the matter has not been resolved within sixty (60) days of the request for negotiation, either party may initiate arbitration in accordance with the Arbitration section of this Agreement by providing written notice to the other party.

2. <u>Arbitration</u>.  If a Dispute is not resolved in accordance with the Informal Dispute Resolution section of this Agreement, either party wishing to pursue the Dispute shall submit it to binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  In no event may any arbitration be initiated more than one (1) year following the end of the sixty (60) day negotiation period of the Informal Dispute Resolution section of this Agreement.  Arbitration proceedings shall be conducted at a mutually agreed upon location within the State.  The arbitrators shall have no right to award any punitive or exemplary damages or to vary or ignore the terms of this Agreement and shall be bound by controlling law.  Each party shall bear its own costs related to the arbitration except that the costs imposed by the AAA shall be shared equally.  The existence of a Dispute or arbitration proceeding shall not in and of itself constitute cause for termination of this Agreement.  During an arbitration proceeding, each party shall continue to perform its obligations under this Agreement pending the decision of the arbitrator.

## ARTICLE X
## TERM AND TERMINATION

1. <u>Term</u>.  This Agreement shall have an initial term of three (3) year(s), commencing on the Effective Date.  Thereafter, this Agreement shall automatically renew for terms of one (1) year each.  Notwithstanding the foregoing, this Agreement may terminate in accordance with the Termination sections below.

2. <u>Termination of Agreement</u>.  This Agreement may be terminated under any of the following circumstances:

   A.  By either party upon one hundred eighty (180) days prior written notice effective at the end of the initial term or at the end of any renewal term;

   B.  By either party upon ninety (90) days prior written notice if the other party is in material breach of this Agreement, except that such termination shall not take place if the breach is cured within sixty (60) days following the written notice;

   C.  Immediately upon written notice by CCN if there is imminent harm to patient health or fraud or malfeasance is suspected;

   D.  Immediately upon written notice by either party if the other party becomes insolvent or has bankruptcy proceedings initiated against it;

   E.  Immediately upon written notice by Provider if CCN loses, relinquishes, or has materially affected its certificate of authority to operate as a coordinated care network; or

   F.  Immediately upon written notice by CCN if Provider fails to adhere to CCN's credentialing criteria, including, but not limited to, if Provider (1) loses, relinquishes, or has materially affected its license to provide Covered Services in the State, (2) fails to comply with the insurance requirements set forth in this Agreement; or (3) is convicted of a criminal offense related to involvement in any Medicare or Medicaid program or has been terminated, suspended, barred, voluntarily withdrawn as part of a settlement agreement, or otherwise excluded from any Medicare or Medicaid program.

3. <u>Termination of Attachment(s).</u> Any Attachment to this Agreement may be terminated by either party upon sixty (60) days prior written notice to the other party.

4. <u>Rights and Obligations Upon Termination</u>.  Upon termination, the rights of each party hereunder shall terminate, provided, however, that such action shall not release the Provider or CCN of their obligations with respect to: (a) payments accrued to Provider prior to termination; (b) Provider's agreement not to seek compensation from Covered Persons for Covered Services prior to termination; and (c) completion of treatment of Covered Persons who are receiving care until continuation of the Covered Person's care can be arranged by CCN as determined by the Medical Director or as required by applicable law or the Payor

Contract.  Services provided during continuation of care shall be reimbursed in accordance with the terms of this Agreement.

5. Survival of Obligations.  Any obligations that cannot be fully performed prior to the termination of this Agreement including, but not limited to, obligations in the following provisions set forth in this Section, shall survive the termination of this Agreement: Article III Section 12 (Disparagement Prohibition); Article IV (Compliance With Law); Article V Section 4 (Covered Person Hold Harmless); Article VI (Records/Inspection); Article VII (Insurance); Article VIII (Indemnification); Article IX (Dispute Resolution); Article X Section 3 (Rights and Obligations Upon Termination).

## ARTICLE XI
## MISCELLANEOUS

1. Relationship of Parties.  The relationship among the parties is that of independent contractors.  None of the provisions of this Agreement are intended to create, or to be construed as creating, any agency, partnership, joint venture, employee-employer, or other relationship.

2. Conflicts Between Certain Documents.  If there is any conflict between this Agreement hereto and the Provider Manual, this Agreement shall control.  In the event of any conflict, however, between this Agreement and any Attachment hereto, the Attachment shall be controlling as to the product described in that Attachment.  In the event of any conflicts between this Agreement, or any Attachment hereto, and the applicable Payor Contract with respect to what services constitute Covered Services, the Payor Contract shall control.

3. Assignment; Delegation of Duties.  This Agreement is intended to secure the services of and be personal to Provider, and shall not be assigned, sublet, delegated or transferred by Provider without the prior written consent of CCN.

4. Headings.  The headings of the sections of this Agreement are inserted merely for the purpose of convenience and do not, expressly or by implication, limit, define, or extend the specific terms of the section so designated.

5. Governing Law.  All matters affecting the interpretation of this Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with applicable federal and State laws.

6. Third Party Beneficiary.  Except as specifically provided herein, the terms and conditions of this Agreement shall be for the sole and exclusive benefit of Provider and CCN.  Nothing herein, express or implied, is intended to be construed or deemed to create any rights or remedies in any third party.

7. Amendment.  This Agreement, including all Attachments, may be amended at any time by mutual written agreement of the parties.  This Agreement and any of its Attachments may also be amended by CCN furnishing Provider with any proposed amendments.  Unless

Provider objects in writing to such amendment during the thirty (30) day notice, Provider shall be deemed to have accepted the amendment. Notwithstanding the foregoing, this Agreement shall be automatically amended as necessary to comply with any applicable State or federal law or regulation and applicable provision of the Payor Contract.

8. <u>Entire Agreement</u>.  This Agreement, its Attachments, and the Provider Manual contain all the terms and conditions agreed upon by the parties and supersede all other agreements, oral or otherwise, of the parties hereto, regarding the subject matter of this Agreement.

9. <u>Severability</u>.  The invalidity or unenforceability of any terms or provisions hereof shall in no way affect the validity or enforceability of any other terms or provisions.

10. <u>Waiver</u>.  The waiver by either party of the violation of any provision or obligation of this Agreement shall not constitute the waiver of any subsequent violation of the same or other provision or obligation.

11. <u>Notices</u>.  Any notice required to be given pursuant to the terms and provisions hereof shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, or by recognized courier service, addressed as follows:

To CCN at:                                    To Ancillary at:

Attn: [_____]          Attn: [_____]

[_____]                 [_____]

[_____]                 [_____]

[_____]                 [_____]

12. <u>Force Majeure</u>.  Neither party shall be liable or deemed to be in default for any delay or failure to perform any act under this Agreement resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquake, flood, strikes or other work stoppages by either party's employees, or any other similar cause beyond the reasonable control of such party.

13. <u>Confidentiality</u>.  Neither party shall disclose the substance of this Agreement nor any information acquired from the other party during the course of or pursuant to this Agreement to any third party, unless required by law.  Provider acknowledges and agrees that all information relating to CCN's programs, policies, protocols and procedures is proprietary information and further agrees not to disclose such information to any person or entity without CCN's express written consent.

14. <u>Authority</u>.  The parties whose signatures are set forth below represent and warrant that they are duly empowered to execute this Agreement.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement effective as of the date first above written.

<u>**CCN:**</u>                                          <u>**Provider:**</u>

_____                                              _____

Authorized Signature                                 Authorized Signature

Printed Name:  Jamie Schlottman                      Printed Name:  _Trey Hoffman_

Title:  CEO & Plan President                          Title:  _Executive Vice President_

Signature Date: _1/24/2012_                           Signature Date:  _8- 15- 2011_

Effective Date of Agreement:_2/1/2012_               Tax Identification Number:  _721351305_
<span style="font-size:smaller">(To be completed by CCN only)</span>

                                                     National Provider Identifier:  _1164537452_

                                                     State Medicaid Number:  _1692573_

ATTACHMENT A

**LOUISIANA COORDINATED CARE NETWORK — PREPAID PROGRAM
PRODUCT ATTACHMENT**

This Louisiana Medicaid Coordinated Care Network Prepaid Program Product Attachment (the "***Product Attachment***") is incorporated into the Ancillary Services Provider Agreement (the "***Agreement***") entered into by and between *Diabetes Management* (in this Product Attachment referred to as "***Provider***") and Louisiana Healthcare Connections ("***CCN***"). *& Supplies, LLC*

## ARTICLE I
## RECITALS

1.1   CCN has contracted with the Louisiana Department of Health and Hospitals ("***DHH***") to arrange for the provision of medical services to Covered Persons under the Coordinated Care Network — Prepaid Program, as defined herein.

1.2   Provider has entered into this Agreement with CCN.  This Product Attachment is intended to supplement this Agreement by setting forth the parties' rights and responsibilities related to the provision of Covered Services to Covered Persons as it pertains to the Coordinated Care Network— Prepaid Program.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of this Product Attachment, this Product Attachment shall govern.

1.3   Provider agrees and understands that Covered Services shall be provided in accordance with the contract between DHH and CCN ("***Medicaid CCN Contract***"), the Provider Manual, any applicable State handbooks or policy and procedure guides, and all applicable State and federal laws and regulations.  To the extent Provider is unclear about Provider's duties and obligations, Provider shall request clarification from CCN.

## ARTICLE II
## DEFINITIONS

The definitions listed below will supersede any meanings contained elsewhere in this Agreement with regard to this Product Attachment.

2.1   ***CCN-P Policy and Procedure Guide*** means the policy and procedure guide for the Coordinated Care Network Prepaid Program providers.

2.2   ***Claim*** means a request for payment for benefits received or services rendered.

2.3   ***Clean Claim*** means (1) a bill for services, (2) a line item of service or (3) all services for one recipient within a bill.  Clean Claim means one that that can be processed without obtaining additional information from Provider or from a third party.  It includes a Claim with errors originating in a State's claims system.  It does not include a Claim from a

provider who is under investigation for fraud or abuse, or a Claim under review for Medical Necessity.

2.4    ***Co-payment*** means any cost sharing payment for which the Covered Person is responsible in accordance with 42 C.F.R. §§ 447.40 and 5006 of the American Recovery and Reinvestment Act (ARRA) or Indian Covered Persons.

2.5    ***CommunityCARE*** means the Louisiana Medicaid Primary Care Case Management program which links Medicaid/CHIP eligibles to a PCP as their medical home.

2.6    ***Coordinated Care Network— Prepaid Program (CCN-P)*** means any prepaid entity that participates in the State Medicaid Program and is regulated by the State Department of Insurance with respect to licensure and financial solvency pursuant to Title 22 of the Louisiana Revised Statutes, but shall solely with respect to its products and services offered pursuant to the State Medicaid program be regulated by the DHH.

2.7    ***Covered Person*** means an individual enrollee of CCN's Coordinated Care Network—Prepaid health plan.

2.8    ***Covered Services*** means those Medically Necessary health care services to which a Covered Person is entitled under the Louisiana Medicaid State Plan.

2.9    ***Early and Periodic Screening, Diagnosis and Treatment (EPSDT)*** means a federally required Medicaid benefit for individuals under the age of twenty-one (21) years that expands coverage for children and adolescents beyond adult limits to ensure availability of (1) screening and diagnostic services to determine physical or mental defects and (2) health care, treatment, and other measures to correct or ameliorate any defects and chronic conditions discovered. EPSDT ensures access to all Medically Necessary health services within the federal definition of "medical assistance".

2.10    ***Emergency Medical Condition*** means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (1) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part.

2.11    ***Emergency Services*** means covered inpatient and outpatient services that are furnished by a provider that is qualified to furnish these services under 42 C.F.R. §§ 438.114(a) and 1032(b)(2), and needed to screen, evaluate and stabilize an Emergency Medical Condition.

2.12    ***Medically Necessary or Medical Necessity*** means health care services that: (1) are in accordance with generally accepted, evidence-based medical standards or that are considered by most physicians (or other independent licensed practitioners) within the

community of their respective professional organizations to be the standard of care; (2) are deemed reasonably necessary to diagnose, correct, cure, alleviate or prevent the worsening of a condition or conditions that endanger life, cause suffering or pain or have resulted or will result in a handicap, physical deformity or malfunctions; (3) not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease; and (4) must be clinically appropriate, individualized, specific and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and neither more nor less than what the recipient requires at that specific point in time.    Services that are experimental, non-FDA approved, investigational, or cosmetic are specifically excluded from Medicaid coverage and will be deemed "not Medically Necessary."

2.13   **Primary Care Provider or PCP** means the individual physician or other licensed nurse practitioner responsible for the management of a Covered Person's health care who is licensed and certified in one of the following general specialties: family practitioner, general practitioner, general pediatrician, general internal medicine, general internal medicine and pediatrics, or obstetrician/gynecologist.  The PCP is the patient's point of access for preventive care or an illness and may treat the patient directly, refer the patient to a specialist or admit the patient to a hospital.

2.14   **Provider Preventable Condition** means preventable hospital and non hospital-acquired conditions and events identified by DHH for nonpayment to ensure high quality of Medicaid services.

2.15   **RFP** means the Louisiana Department of Health and Hospitals Request for Proposal #305PUR-DHHRFP-CCN-P-MVA.

2.16   **State** means the state of Louisiana.

2.17   **State Plan** or **Louisiana Medicaid State Plan** means the binding written agreement between the DHH and the federal Centers for Medicare and Medicaid Services, which describes how the Medicaid program is administered.

2.18   **Unreasonable Delay** shall have the meaning set forth in the CCN-P Policy and Procedure Guide.

2.19   **Urgent Care** means medical care provided for a condition that without timely treatment could be expected to deteriorate into an emergency, or cause prolonged, temporary impairment in one or more bodily functions, or cause the development of a chronic ill or need for a more complex treatment.  Examples include abdominal pain of unknown origin, unremitting new symptoms of dizziness of unknown cause, or suspected fracture. Urgent Care requires timely face-to-face medical attention within twenty-four (24) hours of Covered Person notification of the existence of an urgent condition.

## ARTICLE III
## COORDINATED CARE NETWORK — PREPAID PROGRAM REQUIREMENTS

3.1     This Agreement contains all the terms and conditions agreed upon by the parties. The parties shall make no alteration, variation, modification, waiver, extension of this Agreement's termination date or early termination of this Agreement unless such change is reduced to writing, duly signed and attached to this Agreement; however, CCN may, with prior notice to DHH, provide amendments to Provider by written notification through CCN bulletins, if mutually agreed to in terms of the Agreement. Provider shall not assign any of its duties or responsibilities under this Agreement, or enter into any subcontracts or otherwise delegate services provided thereunder, without CCN's prior written approval. The parties agree that they shall, pursuant to this Section 3.1, amend this Product Attachment as necessary to comply with the State Plan, RFP and other requirements of DHH.

3.2     Covered Services shall be provided in accordance with the State Plan. Provider shall provide Covered Services to Covered Persons through the last day that this Agreement is in effect. Provider acknowledges that all final Medicaid benefit determinations are within the sole and exclusive authority of DHH or its designee.

3.3     Provider shall not refuse to provide Medically Necessary or preventative Covered Services to Covered Persons for non-medical reasons (except those services allowable under federal law for religious or moral objections).

3.4     Provider shall be currently licensed and/or certified under applicable State and federal statutes and regulations and shall maintain throughout the term of this Agreement all necessary licenses, certifications, registrations and permits as are required to provide the health care services and/or other related activities delegated by CCN.

3.5     If Provider performs Emergency Services, Provider shall (i) render Emergency Services without the requirement of prior authorization from CCN of any kind and (ii) determine when the Covered Person is sufficiently stabilized for transfer or discharge. Emergency Services shall be available on a twenty-four (24) hours a day, seven (7) days a week basis.

3.6     If Provider performs laboratory services, Provider shall meet all applicable State and federal requirements related to the provision of laboratory services, including but not limited to 42 C.F.R. §§ 493.1 and 493.3.

3.7     Provider shall permit DHH, U.S. Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services, Office of Inspector General, State Comptroller, State Auditor's Office, and the Louisiana Attorney General's Office to evaluate through audit, inspection, or other means, whether announced or unannounced, any records pertinent to this Agreement, including quality, appropriateness and timeliness of Covered Services and the timeliness and accuracy of encounter data and practitioner

claims submitted to the CCN. CCN shall cooperate with these evaluations and inspections and, upon request, assist with such reviews.

3.8     Provider shall participate and cooperate in any internal and external quality assessment review, utilization management, and grievance procedures established by CCN and/or DHH or its designee, whether announced or unannounced.

3.9     Provider shall monitor and report the quality of Covered Services delivered under this Agreement and initiate a plan of correction where necessary to improve quality of care, in accordance with that level of care which is recognized as acceptable professional practice in the respective community in which Provider practices and/or the standards established by DHH or its designee.

3.10    Provider shall comply with any plan of corrective action initiated by CCN and/or required by DHH.

3.11    Provider shall submit all reports and clinical information required by the CCN, including but not limited to, HEDIS, AHRQ (the Agency for Healthcare Research & Quality), and EPSDT.

3.12    Provider shall safeguard Covered Person information in accordance with applicable State and federal laws and regulations and the standards set forth below:

    3.12.1  Be at least as restrictive as those imposed upon the DHH by 42 CFR Part 431, Subpart F (2005, as amended) and La. R.S. 45:56;

    3.12.2  Identify and comply with any stricter State or federal confidentiality standards which apply to specific types of information or information obtained from outside sources;

    3.12.3  Require the written authorization of the Covered Person or potential Covered Person before disclosure of information about him or her under circumstances requiring such authorization pursuant to 45 C.F.R. § 164.508;

    3.12.4  Not prohibit the release of statistical or aggregate data which cannot be traced back to particular individuals; and

    3.12.5  Subject violators to appropriate personnel sanctions.

Provider further acknowledges that all material and information, in particular information relating to Covered Persons or potential Covered Persons, which is provided to or obtained by or through Provider's performance under this Agreement, whether verbal, written, electronic file, or otherwise, shall be reported as confidential information to the extent confidential treatment is provided under State and federal laws. Provider shall not use any information so obtained in any manner except as necessary for the proper discharge of its obligations and securement of its rights under this Agreement.

All information as to personal facts and circumstances concerning Covered Persons or potential Covered Persons obtained by the Provider shall be treated as privileged communications, shall be held confidential, and shall not be divulged without the written consent of DHH or the Covered Person/potential Covered Person except as otherwise permitted or required by applicable State or federal law or regulations, provided that nothing stated herein shall prohibit the disclosure of information in summary, statistical, or other form which does not identify particular individuals. The use or disclosure of information concerning Covered Persons/potential Covered Persons shall be limited to purposes directly connected with the administration of this Agreement.

3.13   Provider acknowledges and agrees that this Agreement makes full disclosure of the method and amount of compensation or other consideration to be received from CCN.

3.14   Provider shall provide the name and address of the official payee to whom payment shall be made and shall also promptly submit to CCN all information, which shall be complete and accurate, needed for CCN to make payment to Provider for Covered Services provided to Covered Persons hereunder.

3.15   CCN shall pay ninety percent (90%) of all Clean Claims of each provider type within fifteen (15) days of the date of receipt. CCN shall pay ninety-nine percent (99%) of all Clean Claims of each provider type within thirty (30) days of the date of receipt. The date of receipt shall be considered the date CCN receives the Clean Claim, as indicated by the date stamp on the Clean Claim. The date of payment shall be considered is the date of the check or other form of payment.

3.16   Provider shall submit all claims for payment no later than twelve (12) months from the date of service.

3.17   Provider shall accept payment made by CCN as payment-in-full for Covered Services provided and shall not solicit or accept any surety or guarantee of payment from the Covered Person. For purposes of this section, the term, "Covered Person" shall include the patient, and, if applicable, the patient's parent(s), guardian, spouse or any other legally or potentially legally responsible person of the Covered Person.

3.18   At all times during the term of this Agreement, Provider shall indemnify and hold DHH harmless from all claims, losses, or suits relating to activities undertaken pursuant to this Agreement, unless the Provider is a state agency. Specifically, for all Providers that are not state agencies, Provider shall indemnify, defend, protect, and hold harmless DHH and any of its officers, agents, and employees from:

3.18.1 Any claims for damages or losses arising from services rendered by any subcontractor, person, or firm performing or supplying services, materials, or supplies for Provider in connection with the performance of this Agreement;

3.18.2  Any claims for damages or losses to any person or firm injured or damaged by erroneous or negligent acts, including disregard of State or federal Medicaid regulations or legal statutes, by Provider, its officers, employees, or subcontractors in the performance of this Agreement;

3.18.3  Any claims for damages or losses resulting to any person or firm injured or damaged by Provider, its agents, its officers, employees, or contractors by the publication, translation, reproduction, delivery, performance, use, or disposition of any data processed under this Agreement in a manner not authorized by this Agreement or by federal or State regulations or statutes;

3.18.4  Any failure of the Provider, its officers, employees, or subcontractors to observe the federal or State laws, including, but not limited to, labor laws and minimum wage laws;

3.18.5  Any claims for damages, losses, or reasonable costs associated with legal expenses, including, but not limited to, those incurred by or on behalf of DHH in connection with the defense of claims for such injuries, losses, claims, or damages specified above; and

3.18.6  Any injuries, deaths, losses, damages, claims, suits, liabilities, judgments, costs and expenses which may in any manner accrue against DHH or its agents, officers or employees, through the intentional conduct, negligence or omission of the Provider, its agents, officers, employees or subcontractors.

3.19  Provider recognizes and shall abide by all State and federal laws, rules and regulations and guidelines applicable to the provision of Covered Services under the Coordinated Care Network – Prepaid Program.

3.20  This Agreement incorporates by reference all applicable federal and State laws, rules and regulations, and any revisions of such laws, rules or regulations as they become effective. In the event that changes in this Agreement as a result of revisions to applicable federal or State law or regulations materially affect the position of either party, the parties agree to negotiate in good faith such further amendments as may be necessary to correct any inequities.

3.21  The parties recognize that in the event of termination of the Medicaid CCN Contract, CCN shall immediately make available to DHH or its designated representative, in a usable form, any and all records, whether medical or financial, related to the parties' activities undertaken pursuant to this Agreement. The provision of such records shall be at no expense to DHH.

3.22  The parties acknowledge that they are responsible for resolving any disputes in accordance with the provisions of this Agreement, and the parties agree that no dispute shall disrupt or interfere with the provisions of Covered Services to Covered Persons including but not limited to continuity of care.

3.23    Provider shall adhere to the quality assurance and utilization review requirements as outlined in the CCN-P Policy and Procedure Guide, which are incorporated herein by reference.

3.24    Provider shall give CCN immediate notification in writing by certified mail of any litigation, investigation, complaint, claim or transaction that may reasonably be considered to have a material impact on Provider's ability to perform under this Agreement.

3.25    CCN shall not prohibit or otherwise restrict Provider from advising or advocating on behalf of a Covered Person who is Provider's patient (i) for the health status, medical care or treatment options for the Covered Person, including any alternative treatment that may be self-administered; (ii) for any information that the Covered Person needs in order to decide among all relevant treatment option; (iii) for the risks, benefits and consequences of treatment or non-treatment; and (iv) for the Covered Person's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment decisions, provided Provider is acting within the lawful scope of practice.

3.26    In accordance with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et. seq.) (2001, as amended) and its implementing regulation at 45 C.F.R. Part 80 (2001, as amended), Provider shall take adequate steps to ensure that persons with limited English skills receive free of charge the language assistance necessary to afford them meaningful and equal access to the Covered Services provided under this Agreement.

3.27    If Provider is a hospital, Provider shall notify CCN and DHH of births when the mother is a Covered Person and shall complete and electronically submit the DHH Request for Medicaid ID Number to the local DHH/State DHH office.

3.28    If Provider is an FQHC or RHC, the following shall apply:

3.28.1  CCN shall reimburse the FQHC/RHC the PPS rate in effect on the date of service for each encounter.

3.29    CCN shall not propose to Providers reimbursement rates that are less than the published Medicaid fee-for-service rate. Provider agreements shall not contain terms for reimbursement at rates that are less than the published Medicaid fee-for-service rate in effect on the date of service unless a Provider-initiated request has been submitted to and approved by DHH.

3.30    Provider acknowledges that no provision contained in this Agreement provides incentives, monetary or otherwise, for the withholding of Medically Necessary services.

3.31    In accordance with 43 C.F.R. §438.210(e), compensation to CCN or individuals that conduct utilization management activities shall not be structured as to provide incentives

for the individual or CCN to deny, limit, or discontinue Medically Necessary services to any Covered Person.

3.32    CCN is prohibited from making payments to Providers for the provision of medical assistance for healthcare-acquired conditions and other Provider-preventable conditions as may be identified by DHH.

3.33    The provider may only contract with a CCN if such conflict of interest safeguards at least equal to federal safeguards (41 USC 423, section 27) are in place per State Medicaid Director letter dated December 30, 1997 and 1932 (d)(3) of the Social Security Act addressing 1932 State Plan Amendment and the default enrollment process under the State Plan Amendment option.

Provider represents and covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of its services hereunder.   The Provider further covenants that, in the performance of this Agreement, no person having any such known interests shall be employed.

3.34    CCN shall comply with requirements for physician incentive plans, as required by 42 C.F.R 438.6(h) and set forth (for Medicare) in 42 C.F.R. 422.208 and 422.210.  CCN will provide assurance satisfactory to the Secretary that the requirements of § 422.208 are met.   CCN, as applicable will provide the following information to any Medicare beneficiary who requests it: whether the CCN uses a physician incentive plan that affects the use of referral services, the type of incentive arrangement, and whether the stop-loss protection is provided.

3.35    In addition to any requirements contained in this Agreement relating to record maintenance and retention, Provider shall maintain and retain records as follows:

3.35.1  Provider shall maintain an adequate record system for recording services, service providers, charges, dates and all other commonly accepted information elements for Covered Services rendered to Covered Persons pursuant to this Agreement (including but not limited to such records as are necessary for the evaluation of the quality, appropriateness, and timeliness of services performed under this Agreement).  Provider shall give Covered Persons and their representatives access to and copies of the Covered Persons' medical records, to the extent and in the manner provided by La. R. S. § 40:1299.96 and 45 C.F.R. § 164.524, as amended, and subject to reasonable charges.

3.36    Provider shall retain any and all Covered Person records, including but not limited to financial and medical records, for at least six (6) years following the date of final payment for Covered Services provided by Provider to a Covered Person, and for a longer period of time if the records are under review, audit or related to any matter in litigation until the review, audit or litigation is complete.  Exception to this requirement shall include once-in-a-lifetime events such as (but not limited to) an appendectomy, etc.

Records retained pursuant to this subsection shall be made available for fiscal audit, medical audit, medical review, utilization review and other periodic monitoring upon request of any authorized representative of DHH.

3.37    Provider shall retain all records originated or prepared in connection with Provider's performance of its obligations under this Agreement, including but not limited to working papers related to the preparation of fiscal reports, medical records, progress notes, charges, journals, ledgers and electronic media, in the State and shall safeguard such records in accordance with the terms and conditions of the Medicaid CCN Contract. Provider further agrees to retain all financial and programmatic records, supporting documents, statistical records and other records of Covered Persons relating to the delivery of care or service under this Agreement, and as further required by DHH, for a period of six (6) years from the expiration date of this Agreement, including any extensions. If any litigation, claim, or other actions involving the records have been initiated prior to the expiration of such period, the records shall be retained until completion of the action and resolution of all issues which arise from it or until the end of such period, whichever is later. If Provider stores records on microfilm or microfiche, Provider must agree to produce, at its expense, legible hard copy records upon the request of State or federal authorities, within twenty-one (21) calendar days of the request.

3.38    Provider acknowledges and agrees that this Agreement specifies the amount, duration and scope of services to be provided by Provider and informs Provider of Covered Services under the State Plan, including all specific provider requirements outlined in the Medicaid CCN Contract and/or CCN-P Policy and Procedure Guide.

3.39    Provider shall adhere to all requirements for CCN's Participating Health Care Providers set forth in the RFP, the Medicaid CCN Contract and CCN-P Policy & Procedure Guide, which terms are incorporated herein by this reference. CCN shall furnish these documents to Provider upon request.

3.40    CCN may not make payment to Provider for Provider Preventable Conditions.

3.41    At the direction of DHH, CCN shall impose financial penalties on Provider in the event Provider fails or refuses to respond to CCN's request for medical record information.

3.42    In the event CCN and Provider have entered into an alternative reimbursement arrangement, subject to prior approval by DHH, Provider shall submit all encounter data to the same standards of completeness and accuracy as required for proper adjudication of fee-for-service claims by the CCN.

3.43    In accordance with 42 C.F.R. §438.106(c) and 1932(b)(6) of the Social Security Act, Provider shall not bill Covered Persons for Covered Services payments any amount greater than would be owed if the CCN provided the services directly.

3.44    Providers shall submit all claims for payment no later than no later than twelve (12) months from the date of service. EPSDT screening claims should be submitted within

sixty (60) days from date of service to accommodate for frequency of screening services and for EPSDT reporting requirements. EPSDT screening claims must also include information related to immunizations, referrals and health status as published in the EPSDT Services Rule (contained in the Louisiana Register, Vol. 30, No.8).

3.45    Providers, as applicable, shall register through LEERS (Louisiana Electronic Event Registration System) which is administered by DHH/Vital Records Registry.

3.46    If Provider is a PCP, PCP shall specify the maximum number of linkages the CCN may link to the PCP. PCP shall also stipulate that by signing the Agreement, PCP confirms that the PCP's total number of Medicaid members for the CCN Program will not exceed 2,500 lives.

## ARTICLE IV
## STATE MANDATED REQUIREMENTS

4.1    In the event CCN fails to pay for Covered Services as set forth in the evidence of coverage, the Covered Person will not be liable to Provider for any sums owed by CCN.

4.2    Provider acknowledges and agrees to the procedure for processing and resolving grievances and the location and telephone number where grievances may be submitted is set forth in the Provider Manual in accordance with La. R. S. § 22:263.

## ARTICLE V
## CCN-P POLICY AND PROCEDURE GUIDE REQUIREMENTS

5.1    Provider shall not enter into any subsequent agreements or subcontracts for any of the work contemplated under this Agreement without the prior approval of CCN.

5.2    The parties acknowledge and agree that the defined term "Covered Person" identifies the population covered by this Agreement.

5.3    Notwithstanding Section 3.7 herein, Provider shall not be required to accept or continue treatment of a patient with whom Provider feels he/she cannot establish and/or maintain a professional relationship.

5.4    Provider is not permitted to encourage or suggest, in any way, that Covered Persons be placed in State custody in order to receive medical or specialized behavioral health services covered by DHH.

5.5    Provider shall comply and submit to CCN disclosure of information in accordance with the requirement specified in 42 C.F.R. § 455, Subpart B.

5.6    If any requirement in this Agreement is determined by DHH to conflict with the Medicaid CCN Contract, such requirement shall be null and void and all other provisions shall remain in full force and effect.

# EXHIBIT 1
## COMPENSATION SCHEDULE - MEDICAID

---

For Covered Services provided to Covered Persons, Payor shall pay Provider the lesser of: (i) the Provider's Allowable Charges; or (ii) one hundred percent (100%) of the Payor's maximum reimbursement fee schedule in effect on the date of service.

### *Additional Provisions:*

1. <u>Code Change Updates</u>. Updates to billing-related codes (e.g., CPT, HCPCS, ICD-9, DRG, and revenue codes) shall become effective on the date ("Code Change Effective Date") that is the later of: (i) the first day of the month following thirty (30) days after publication by the governmental agency having authority over the applicable product of such governmental agency's acceptance of such code updates; or (ii) the effective date of such code updates, as determined by such governmental agency. Claims processed prior to the Code Change Effective Date shall not be reprocessed to reflect any code updates.

2. <u>Fee Change Updates</u>. Updates to such fee schedule shall become effective on the date ("Fee Change Effective Date") that is the later of: (i) the first day of the month following thirty (30) days after publication by the governmental agency having authority over the applicable product of such governmental agency's acceptance of such fee schedule updates; or (ii) the effective date of such fee schedule updates, as determined by such governmental agency. Claims processed prior to the Fee Change Effective Date shall not be reprocessed to reflect any updates to such fee schedule.

3. <u>Payment under this Exhibit</u>. All payments under this Exhibit are subject to the terms and conditions set forth in the Agreement and the Provider Manual.

### *Definitions:*

1. **Allowable Charges** means those Provider billed charges for services that qualify as Covered Services.